UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

SEAN D. MOON,

                Plaintiff,

   v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

                Defendant.

Case No. 3:11-cv-05230-RJB-KLS

REPORT AND RECOMMENDATION

Noted for March 30, 2012

Plaintiff has brought this matter for judicial review of defendant's denial of his application for disabled adult child benefits.[1] This matter has been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule MJR 4(a)(4) and as authorized by <u>Mathews, Secretary of H.E.W. v. Weber</u>, 423 U.S. 261 (1976). After reviewing the parties' briefs and the remaining record, the undersigned submits the following Report and Recommendation for the Court's review, recommending that for the reasons set forth below, defendant's decision to deny benefits should be affirmed.

<u>FACTUAL AND PROCEDURAL HISTORY</u>

On January 5, 2007, plaintiff filed an application for disabled adult child benefits, alleging disability as of January 25, 1987, due to depression, suicidal and homicidal thoughts, agoraphobia, and an eating disorder. See Administrative Record ("AR") 14, 52, 86. His

---

[1] A claimant for adult child disability benefits will be entitled to such benefits if he or she is "18 years old or older and ha[s] a disability that began before [he or she] became 22 years old." 20 C.F.R. § 404.350(a). Plaintiff attained the age of 22 on September 24, 1993, and therefore to be entitled to disabled child benefits, he must establish he was disabled prior to that date. As discussed in greater detail below, plaintiff has not done so.

REPORT AND RECOMMENDATION - 1

application was denied upon initial administrative review and on reconsideration. See AR 14, 38, 42. A hearing was held before an administrative law judge ("ALJ") on July 14, 2009, at which plaintiff, represented by counsel, appeared and testified, as did a vocational expert. See AR 23-35.

On September 2, 2009, the ALJ issued a decision in which plaintiff was determined to be not disabled. See AR 14-22. Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on January 19, 2011, making the ALJ's decision defendant's final decision. See Tr. 1; see also 20 C.F.R. § 404.981. On March 24, 2011, plaintiff filed a complaint in this Court seeking judicial review of defendant's decision. See ECF #1-#3. The administrative record was filed with the Court on August 9, 2011. See ECF #10. The parties have completed their briefing, and thus this matter is now ripe for the Court's review.

Plaintiff argues the ALJ's decision should be reversed and remanded to defendant for further administrative proceedings, because the ALJ erred: (1) in evaluating the medical evidence in the record; (2) in assessing plaintiff's credibility; (3) in evaluating the lay witness evidence in the record; (4) in assessing plaintiff's residual functional capacity; and (5) in finding him capable of performing other work existing in significant numbers in the national economy. For the reasons set forth below, the undersigned disagrees that the ALJ erred in determining plaintiff to be not disabled, and therefore recommends that defendant's decision be affirmed.

## DISCUSSION

This Court must uphold defendant's determination that plaintiff is not disabled if the proper legal standards were applied and there is substantial evidence in the record as a whole to support the determination. See Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to

REPORT AND RECOMMENDATION - 2

support a conclusion. See Richardson v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985). It is more than a scintilla but less than a preponderance. See Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991). If the evidence admits of more than one rational interpretation, the Court must uphold defendant's decision. See Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).

I.  The ALJ's Evaluation of the Medical Evidence in the Record

The ALJ is responsible for determining credibility and resolving ambiguities and conflicts in the medical evidence. See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). Where the medical evidence in the record is not conclusive, "questions of credibility and resolution of conflicts" are solely the functions of the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th Cir. 1982). In such cases, "the ALJ's conclusion must be upheld." Morgan v. Commissioner of the Social Sec. Admin., 169 F.3d 595, 601 (9th Cir. 1999). Determining whether inconsistencies in the medical evidence "are material (or are in fact inconsistencies at all) and whether certain factors are relevant to discount" the opinions of medical experts "falls within this responsibility." Id. at 603.

In resolving questions of credibility and conflicts in the evidence, an ALJ's findings "must be supported by specific, cogent reasons." Reddick, 157 F.3d at 725. The ALJ can do this "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Id. The ALJ also may draw inferences "logically flowing from the evidence." Sample, 694 F.2d at 642. Further, the Court itself may draw "specific and legitimate inferences from the ALJ's opinion." Magallanes v. Bowen, 881 F.2d 747, 755, (9th Cir. 1989).

REPORT AND RECOMMENDATION - 3

The ALJ must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of either a treating or examining physician. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Even when a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Id. at 830-31. However, the ALJ "need not discuss *all* evidence presented" to him or her. Vincent on Behalf of Vincent v. Heckler, 739 F.3d 1393, 1394-95 (9th Cir. 1984) (citation omitted) (emphasis in original). The ALJ must only explain why "significant probative evidence has been rejected." Id.; see also Cotter v. Harris, 642 F.2d 700, 706-07 (3rd Cir. 1981); Garfield v. Schweiker, 732 F.2d 605, 610 (7th Cir. 1984).

In general, more weight is given to a treating physician's opinion than to the opinions of those who do not treat the claimant. See Lester, 81 F.3d at 830. On the other hand, an ALJ need not accept the opinion of a treating physician, "if that opinion is brief, conclusory, and inadequately supported by clinical findings" or "by the record as a whole." Batson v. Commissioner of Social Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004); see also Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir. 2001). An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, 81 F.3d at 830-31. A non-examining physician's opinion may constitute substantial evidence if "it is consistent with other independent evidence in the record." Id. at 830-31; Tonapetyan, 242 F.3d at 1149.

Plaintiff argues the ALJ erred in failing to give any weight to the global assessment of functioning ("GAF") score of 40[2] provided by Charles Berthold, Ph.D., in early December 1993.

---

[2] A GAF score is "a subjective determination based on a scale of 100 to 1 of 'the [mental health] clinician's judgment of [a claimant's] overall level of functioning.'" Pisciotta v. Astrue, 500 F.3d 1074, 1076 n.1 (10th Cir. 2007). It is "relevant evidence" of the claimant's ability to function mentally. England v. Astrue, 490 F.3d 1017, 1023, n.8 (8th Cir. 2007). As noted by the ALJ below, "[a] GAF score of 31-40 indicates some impairment in

REPORT AND RECOMMENDATION - 4

See AR 169. With respect to that GAF score, the ALJ found as follows:

> The medical evidence indicates that the claimant was dependent on his mother, and that he made little effort in seeking productive employment or in getting along with others. At the end of 1993, Charles Berthold, Ph.D., a clinical psychologist at the Dreyer Medical Center, noted that the claimant lacked proper emotional distance from his mother and engaged in self-defeating behavior that kept him dependent on her. (Ex. 1F, p. 25). Dr. Berthold initially diagnosed the claimant as having dysthymia, an avoidant personality disorder, and obesity. (Ex. 1F, p. 26). Dr. Berthold also gave the claimant a GAF [score] of 40 on December 6, 1993. Based on the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition-Text Revision (DSM-IV-TR), a GAF rating 31-40 constitutes some impairment in reality testing or communication (*e.g.*, speech at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. A GAF, however, is essentially a snapshot of an individual's condition at a given time. Dr. Berthold always believed the claimant was capable of performing work. On a private insurance disability report from 1995, Dr. Berthold stated that the claimant suffered from obesity and had reactive depression secondary to his obesity. (Ex. 1F, p. 1). Despite these conditions, Dr. Berthold believed that the claimant was not incapacitated. (Ex. 1F, p. 1). Dr. Berthold's opinion is given significant weight, as he is a treating psychologist who saw the claimant both during and after the alleged disability period.

AR 20-21. Plaintiff argues the above GAF score was based on Dr. Berthold's clinical findings. But as the ALJ pointed out, the record reveals Dr. Berthold did not feel plaintiff was incapable of working as either the GAF score or plaintiff's own self-reports would indicate.

In late January 1994, for example, Dr. Berthold commented extensively on plaintiff's ongoing apparent lack of desire to pursue beneficial treatment:

> . . . [Plaintiff] is once again very resistant to considering the idea of medication. He latches onto the idea that we do not know precisely the mechanism that happens with the neurotransmitters with anti-depressants and that therefore he should not have to take any anti-depressants and that in any case he does not feel as though he is depressed so why would he be taking an anti-depressant for that if he is not depressed. He goes on and on with this

---

reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas such as work or school, family relations, judgment, thinking or mood." White v. Commissioner of Social Sec., 572 F.3d 272, 276 (6th Cir. 2009 (quoting Edwards v. Barnhart, 383 F.Supp.2d 920, 924 n. 1 (E.D.Mich. 2005)).

REPORT AND RECOMMENDATION - 5

and keeps mentioning possible excuses or puts up obstacles to dealing with his
treatment plan. I finally made the interpretation to him that it sounded as
though he wanted to be taken care of. [Plaintiff] became quite irritated at that
provocative interpretation which I believe was in fact right on the mark.
[Plaintiff] does not appear to be willing to follow recommendations at this
point . . .

AR 165. Dr. Berthold, furthermore, reported continued improvement in plaintiff's mental health after issuing the initial GAF score. See AR 148-49, 154-56, 159-61, 163. On May 4, 1994, Dr. Berthold stated his belief that plaintiff had an unreasonable notion about the amount of additional weight he needed to first lose "in order to be able to seek employment and [to] avoid [the] social humiliation" that he feared, indicating that from a mental – as well as a physical – standpoint, Dr. Berthold deemed plaintiff to be capable of working. AR 159.

Indeed, just seven days later, Dr. Berthold reported that plaintiff "seem[ed] to be more amenable to considering a somewhat higher target for weight loss at which point he would be able to start looking for a job." AR 158. In early July 1994, Dr. Berthold reported that plaintiff was "planning to work his way west to join his father," stating further that:

. . . When asked about following up with medication and/or surgical
intervention, he indicates that he is not going to do that. That is to say he is
not really going to consider either of those two approaches and is instead
going to hope that movement away from his mother and setting his sights on
goals and being on the road and having to work for income to live will
perhaps motivate him enough to lose the weight.

AR 157. In late July 1994, plaintiff again told Dr. Berthold that he was "now preparing to go on his journey which will take him eventually to his father's in Oregon," and that he "may do some working on his way out." Id. At the same time, Dr. Berthold reported that plaintiff's "spirits are generally quite good, and he seems really quite optimistic about how this may work out for him." AR 156.

In mid-August 1994, plaintiff told Dr. Berthold that he was "now more motivated" about

REPORT AND RECOMMENDATION - 6

"finding a job." AR 156. In late September 1994, Dr. Berthold stated plaintiff was "actually talking now about wanting to really get out in the workplace." AR 155. In late December 1994, plaintiff talked "about having put in some job applications," and Dr. Berthold believed plaintiff now was "going to start pursuing this even more energetically in the upcoming time." AR 154. In early January 1995, plaintiff told Dr. Berthold that he had been "actively seeking employment and had put out applications in quite a few places." Id. Dr. Berthold also noted plaintiff seemed "to be feeling okay about stepping back out into public life." Id.

However, in late January 1995, Dr. Berthold again noted plaintiff's seeming desire to not have to go out and perform work:

> . . . If [plaintiff] should not be able to comply with the recommended treatment, then I believe at some point we will have no choice but to discontinue any further treatment as would become apparent at that point that the gain of avoiding any kind of employment and so forth would be rather far beyond any utility in continuing the treatment without prescribed medication, etc. He is talking about trying to get some type of disability and is applying for it. This would be a way of helping his mother financially and it is true that they are both rather strapped for finances and I feel somewhat uneasiness [sic] though with this concept in the sense that we may be perpetuating an avoidance by doing so. . . .

AR 152. Thus, as Dr. Berthold's progress notes indicate, plaintiff was – and seems to have felt himself to be – capable of working, but apparently has refused to follow recommended treatment, and instead appears to have applied for disability benefits more as a way of avoiding having to actually do so.

Plaintiff takes issue with the ALJ's reliance on Dr. Berthold's statement in late November 1995, that neither plaintiff's obesity nor his "reactive depression" were "incapacitating," because the ALJ failed to state any convincing reason for rejecting Dr. Berthold's further statement at the time that those conditions were still "functionally serious." AR 143. But any error on the part of the ALJ in not mentioning this additional statement was harmless. See Stout v. Commissioner,

REPORT AND RECOMMENDATION - 7

Social Security Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (error harmless where it is non-prejudicial to claimant or irrelevant to ALJ's ultimate disability conclusion); see also Parra v. Astrue, 481 F.3d 742, 747 (9th Cir. 2007) (finding any error by ALJ would not have affected "ALJ's ultimate decision."). This is because Dr. Berthold did not define what he meant by the phrase "functionally serious," nor did he give any indication he intended it to mean plaintiff suffered from significant mental or functional limitations, particularly given that, as discussed above, Dr. Berthold's notes clearly indicate he believed plaintiff was avoiding having to work, when he was in fact apparently capable of working.

Plaintiff argues the ALJ also erred in failing to mention a November 13, 1993 treatment note from J. W. Karesh, M.D., in which plaintiff reported having symptoms of depression and fatigue, as well as a weight gain of 120 pounds over the past three years, and in which he was diagnosed with morbid obesity and depression. See AR 732. But "[t]he mere existence of an impairment is insufficient proof of a disability." Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir. 1993). So too is the mere existence of weight gain or other impairment-related symptoms, without at least some indication of actual work-related limitations caused thereby. Dr. Karesh, however, gave no such indication. See AR 732. In addition, as discussed in greater detail below, the ALJ properly discounted plaintiff's credibility with respect to his subjective complaints. Plaintiff points to reports of "serious suicidal ideation" in late January 1995 (AR 153), which he asserts the ALJ also should have mentioned. However, here too plaintiff makes no showing that any work-related limitations were found to stem therefrom.

Lastly, plaintiff asserts the ALJ further erred in failing to mention he was hospitalized for such ideation in December 2007. See AR 172-81. But as plaintiff himself acknowledges, "this is four years after the relevant time period in this case." ECF #14, p. 11. Although plaintiff asserts

REPORT AND RECOMMENDATION - 8

"this evidence is nevertheless relevant as it shows that [his] impairments were more severe than they were found to be by the ALJ" (id.), the medical evidence in the record indicates otherwise, especially in light of the progress notes from Dr. Berthold showing plaintiff actually appeared to be capable of performing work, but sought to avoid doing so. That is, even if the hospitalization in December 2007, is indicative of more serious mental functional limitations than found by the ALJ, the record fails to show such existed prior to or as of September 24, 1993, the date plaintiff reached the age of 22.[3] See AR 16.

## II. The ALJ's Assessment of Plaintiff's Credibility

Questions of credibility are solely within the control of the ALJ. See Sample, 694 F.2d at 642. The Court should not "second-guess" this credibility determination. Allen, 749 F.2d at 580. In addition, the Court may not reverse a credibility determination where that determination is based on contradictory or ambiguous evidence. See id. at 579. That some of the reasons for discrediting a claimant's testimony should properly be discounted does not render the ALJ's determination invalid, as long as that determination is supported by substantial evidence. Tonapetyan , 242 F.3d at 1148.

To reject a claimant's subjective complaints, the ALJ must provide "specific, cogent reasons for the disbelief." Lester, 81 F.3d at 834 (citation omitted). The ALJ "must identify what testimony is not credible and what evidence undermines the claimant's complaints." Id.; see also Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993). Unless affirmative evidence shows the

---

[3] Medical reports "containing observations made after the period for disability are relevant to assess the claimant's disability" during that period. Smith v. Bowen, 849 F.2d 1222, 1225 (9th Cir. 1988); Kemp v. Weinberger, 522 F.2d 967, 969 (9th Cir. 1975). Because such reports "are inevitably rendered retrospectively," they "should not be disregarded solely on that basis." Smith, 849 F.2d at 1225 (citing Bilby v. Schweiker, 762 F.2d 716, 719 (9th Cir. 1985)). However, "claimants who apply for benefits for a current disability after the expiration of their insured status" will be entitled to them only if they can "prove that the current disability has existed continuously since a date on or before the date that their insurance coverage lapsed." Flaten v. Secretary of Health & Human Services, 44 F.3d 1453, 1462 (9th Cir. 1995). Plaintiff has not met that burden of proof here.

REPORT AND RECOMMENDATION - 9

claimant is malingering, the ALJ's reasons for rejecting the claimant's testimony must be "clear and convincing." Lester, 81 F.2d at 834. The evidence as a whole must support a finding of malingering. See O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003).

In determining a claimant's credibility, the ALJ may consider "ordinary techniques of credibility evaluation," such as reputation for lying, prior inconsistent statements concerning symptoms, and other testimony that "appears less than candid." Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996). The ALJ also may consider a claimant's work record and observations of physicians and other third parties regarding the nature, onset, duration, and frequency of symptoms. See id.

The ALJ in this case discounted plaintiff's credibility for the following reasons:

> The testimony and the medical evidence[4] do not support a finding that the claimant was disabled from working in the relevant time period of January 25, 1987 to September 23, 1993.
>
> There is very little evidence of what the claimant's daily activities were during this time period. While the claimant served in the military and handled a newspaper delivery route during this time and left both enterprises, there is no indication that he was incapable of taking care of himself. Likewise, the claimant's testimony about his symptoms showed he did not want to be in the military and did not want the newspaper delivery route, yet he has not described how his ailments made him incapable of performing that work.
>
> The claimant has spent much of the past two decades in individual or group therapy, including portions of the relevant time period. (Ex. 4F, 6F, and 16F). Despite the claimant's failure to improve during this time, he did not try medication for his depression until two years after the relevant time period. (Ex. 4F, p. 219-221, and 7F, p. 7). The claimant's regular use of counseling is inconsistent with his testimony that he has "been in denial" about his mental illness for many years.

---

[4] Noting further that while "[t]he medical evidence of record is substantial . . . little of this evidence relates to the time frame relevant" to plaintiff's application for adult child disability benefits. AR 20; see also Flaten, 44 F.3d at 1462 (noting in regard to retrospective diagnoses that "claimants who apply for benefits for a current disability after the expiration of their insured status" will be entitled to them only if they can "prove that the current disability has existed continuously since a date on or before the date that their insurance coverage lapsed").

REPORT AND RECOMMENDATION - 10

> Likewise, the claimant has not pursued proper avenues of treatment to deal with obesity. The claimant has occasionally worked out at the YMCA to address his weight issues, but that primarily took place after the disability period in question. (Ex. 5E).
>
> The claimant has been inconsistent in describing his military service. During the hearing, he testified that, after going absent without leave to attend his uncle's funeral, he decided he did not want to stay in the military and made efforts to be kicked out of the service. However, the claimant also stated on a Work Activity Report that he left the military due to his medical conditions. (Ex. 1E). The claimant's psychological evaluation from his military service notes that the claimant could not work with others and needed supervision. (Ex. 3F, p. 3). The evaluation noted that the claimant had made no effort to perform his duties.

AR 20. The undersigned agrees with plaintiff that discounting his credibility on the basis that "[t]here is very little evidence" of his daily activities during the relevant time period (id), is not a clear and convincing reason for doing so. The Ninth Circuit has recognized "two grounds for using daily activities to form the basis of an adverse credibility determination." Orn v. Astrue, 495 F.3d 625, 639 (9th Cir. 2007). First, such activities can "meet the threshold for transferable work skills." Id. Second, they can "contradict his [or her] other testimony." Id.

Under the first ground, a claimant's testimony may be rejected if the claimant "is able to spend a substantial part of his or her day performing household chores or other activities that are transferable to a work setting." Smolen, 80 F.3d at 1284 n.7. But the claimant need not be "utterly incapacitated" to be eligible for disability benefits, and "many home activities may not be easily transferable to a work environment." Id. In addition, the Ninth Circuit has "recognized that disability claimants should not be penalized for attempting to lead normal lives in the face of their limitations." Reddick, 157 F.3d at 722.

The absence of evidence of activities of daily living as in this case, however, is not the same as the existence of actual evidence of such activities at a level indicative of transferability of work skills, nor does such absence necessarily contradict plaintiff's testimony. Accordingly,

REPORT AND RECOMMENDATION - 11

the undersigned finds the ALJ erred here. That being said, the undersigned finds the ALJ's other stated reasons for discounting plaintiff's credibility to be valid. See Bray v. Commissioner of Social Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009) (while ALJ relied on improper reason for discounting claimant's credibility, he presented other valid, independent bases for doing so, each with "ample support in the record"); Tonapetyan, 242 F.3d at 1148 (fact that one reason for discounting credibility is improper, this does not render ALJ's credibility determination invalid, as long as it is supported by substantial evidence).

First, as discussed above, the ALJ did not err in evaluating the medical evidence in the record, which indicates a greater ability to work than alleged by plaintiff. As such, this was a valid reason for discounting plaintiff's credibility offered by the ALJ here. See Regennitter v. Commissioner of SSA, 166 F.3d 1294, 1297 (9th Cir. 1998) (finding that claimant's complaints are "inconsistent with clinical observations" can satisfy clear and convincing requirement). Second, the record does show plaintiff exhibited a lack of effort and desire to leave the military for reasons other than his medical impairments. See AR 772-81 (noting as reasons for plaintiff's military discharge, his "misconduct and apathy," his "[r]efusal to put forth effort," his wanting "NO PART OF THE TEAM EFFORT," and his "CLEARLY EXPRESS[ED] . . . INTEREST IN LEAVING THE SERVICE NO MATTER WHAT THE COST") (emphasis in original); Smolen, 80 F.3d at 1284 (claimant's prior inconsistent statements concerning symptoms and work record may be considered in discounting his or her credibility).

The ALJ also correctly noted the inconsistency between plaintiff's "regular use of counseling with his testimony that he ha[d] 'been in denial' about his mental illness for many years." AR 20; see also Smolen, 80 F.3d at 1284. In addition, plaintiff's noted failure to "try medication for his depression until two years after the relevant time period" or pursue "proper

REPORT AND RECOMMENDATION - 12

avenues of treatment to deal with obesity" during that period, also were valid reasons for finding him to be not fully credible. See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) (upholding ALJ in discounting credibility in part due to lack of consistent treatment; noting fact that claimant's pain was not sufficiently severe to motivate her to seek treatment, even if she had sought some treatment, was powerful evidence regarding extent to which she was in pain); Meanal v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (ALJ properly considered failure to request serious medical treatment for supposedly excruciating pain); Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (ALJ properly found prescription for conservative treatment only to be suggestive of lower level of pain and functional limitation); Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989) (failure to assert good reason for not seeking or following a prescribed course of treatment "can cast doubt on the sincerity of the claimant's pain testimony").

III.     The ALJ's Evaluation of the Lay Witness Evidence in the Record

Lay testimony regarding a claimant's symptoms "is competent evidence that an ALJ must take into account," unless the ALJ "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." Lewis v. Apfel, 236 F.3d 503, 511 (9th Cir. 2001). In rejecting lay testimony, the ALJ need not cite the specific record as long as "arguably germane reasons" for dismissing the testimony are noted, even though the ALJ does "not clearly link his determination to those reasons," and substantial evidence supports the ALJ's decision. Id. at 512. The ALJ also may "draw inferences logically flowing from the evidence." Sample, 694 F.2d at 642.

As indicated above, the record contains a recommendation from plaintiff's commanding officer from when plaintiff was in the military service, that plaintiff be discharged therefrom. See AR 772-81. With respect to that recommendation and plaintiff's military service in general, the

REPORT AND RECOMMENDATION - 13

ALJ, as noted above found as follows:

> The claimant has been inconsistent in describing his military service. During the hearing, he testified that, after going absent without leave to attend his uncle's funeral, he decided he did not want to stay in the military and made efforts to be kicked out of the service. However, the claimant also stated on a Work Activity Report that he left the military due to his medical conditions. (Ex. 1E). The claimant's psychological evaluation from his military service notes that the claimant could not work with others and needed supervision. (Ex. 3F, p. 3). The evaluation noted that the claimant had made no effort to perform his duties.

AR 20. Plaintiff argues the ALJ erred in describing his commanding officer's recommendation as a psychological evaluation. While the undersigned agrees this technically was an error on the part of the ALJ, it is not at all clear what harm this caused, nor has plaintiff argued or pointed to any to the extent that it would affect the ALJ's ultimate disability determination. See Stout, 454 F.3d at 1055; Parra, 481 F.3d at 747 (9th Cir. 2007).

Plaintiff further argues the ALJ erred in failing to note his commanding officer stated he needed *constant* supervision. AR 775. But there is no real indication that the expressed need for constant supervision was viewed as being related to a perceived mental impairment or, which is just as likely, plaintiff's several AWOL attempts, one of which was successful. See AR 775-78. Thus, again, plaintiff has failed to show harmful error here. Lastly, plaintiff argues the ALJ did not state any reason for rejecting all the limitations described by plaintiff's commanding officer in his discharge recommendation. But it is not clear what those limitations are, nor does plaintiff point to any specific ones, other than perhaps in regard to the need for constant supervision noted above. In addition, given that as noted by the ALJ, plaintiff himself testified at the hearing that he made efforts to get kicked out of the military – as opposed to being discharged due to mental health reasons – and his commanding officer's recommendation itself contains evidence of such efforts and refusal to cooperate on plaintiff's part, the ALJ was not remiss in treating this as more

REPORT AND RECOMMENDATION - 14

evidence of plaintiff's lack of credibility in terms of his alleged disability.

IV.     The ALJ's Assessment of Plaintiff's Residual Functional Capacity

Defendant employs a five-step "sequential evaluation process" to determine whether a claimant is disabled. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. If the claimant is found disabled or not disabled at any particular step thereof, the disability determination is made at that step, and the sequential evaluation process ends. See id. If a disability determination "cannot be made on the basis of medical factors alone at step three of the evaluation process," the ALJ must identify the claimant's "functional limitations and restrictions" and assess his or her "remaining capacities for work-related activities." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 *2. A claimant's residual functional capacity ("RFC") assessment is used at step four to determine whether he or she can do his or her past relevant work, and at step five to determine whether he or she can do other work. See id.

A claimant's residual functional capacity is thus what the claimant "can still do despite his or her limitations." Id. It is the maximum amount of work the claimant is able to perform based on all of the relevant evidence in the record. See id. However, an inability to work must result from the claimant's "physical or mental impairment(s)." Id. Thus, the ALJ must consider only those limitations and restrictions "attributable to medically determinable impairments." Id. In assessing a claimant's RFC, the ALJ also is required to discuss why the claimant's "symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." Id. at *7.

In this case, the ALJ assessed plaintiff with the residual functional capacity to perform a full range of work at all exertional levels, but with no public contact and with only occasional co-worker interaction. See AR 19. Because the ALJ did not err in evaluating the objective medical

REPORT AND RECOMMENDATION - 15

or lay witness evidence in the record or in discounting plaintiff's credibility, the undersigned rejects plaintiff's assertion that the ALJ erred in assessing his RFC on the basis of such errors.

Plaintiff argues as well that the ALJ erred in not also considering evidence from his successful 1995 application for supplemental security income benefits, based upon which he apparently was found to be disabled as of 1995. See ECF #14, pp. 15-17. But there is nothing in the record or otherwise before the Court to indicate there is evidence related to that application relevant to this case, particularly considering it appears plaintiff was found to be disabled *beginning* in 1995, well after the relevant time period here.[5]

V.     The ALJ's Findings at Step Five

If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation process the ALJ must show there are a significant number of jobs in the national economy the claimant is able to do. See Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e). The ALJ can do this through the testimony of a vocational expert or by reference to defendant's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

An ALJ's findings will be upheld if the weight of the medical evidence supports the hypothetical posed by the ALJ. See Martinez v. Heckler, 807 F.2d 771, 774 (9th Cir. 1987); Gallant v. Heckler, 753 F.2d 1450, 1456 (9th Cir. 1984). The vocational expert's testimony

---

[5] Citing SSR 83-20, 1983 WL 31249, plaintiff argues that because he was found to be disabled beginning 1995, in relation to his SSI application, there is an issue as to whether his disability actually began prior to the date he turned age 22, and thus the ALJ erred in failing to call a medical expert on this issue. This argument is without merit. SSR 83-20 sets forth defendant's policy when establishing a claimant's onset date of disability. That ruling comes into play, however, only *after* the claimant has met the "ultimate burden" of proving disability prior to the expiration of his or her insured status. Armstrong v. Commissioner of the Social Security Administration, 160 F.3d 587, 590 (9th Cir. 1998). In other words, it is only when the claimant has established disability *and* the "record is ambiguous as to the onset date of disability," that SSR 83-20 comes into play and requires the ALJ to "assist the claimant in creating a complete record" that "forms a basis for" establishing a disability onset date. Id. Plaintiff has not made this showing here. Nor can SSR 83-20 be used to attempt to find additional evidence, which could possibly support his claim that is not currently in the record before the Court.

REPORT AND RECOMMENDATION - 16

therefore must be reliable in light of the medical evidence to qualify as substantial evidence. See Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988). Accordingly, the ALJ's description of the claimant's disability "must be accurate, detailed, and supported by the medical record." Id. (citations omitted). The ALJ, however, may omit from that description those limitations he or she finds do not exist. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

At the hearing, the ALJ posed a hypothetical question to the vocational expert containing substantially the same limitations as were included in the ALJ's assessment of plaintiff's residual functional capacity. See AR 32-33. In response to that question, the vocational expert testified that an individual with those limitations – and with the same age, education and work experience as plaintiff – would be able to perform other jobs. See AR 33. Based on the testimony of the vocational expert, the ALJ found plaintiff would be capable of performing other jobs existing in significant numbers in the national economy. See AR 21-22.

Plaintiff argues the ALJ's hypothetical question did not contain all of his limitations, but fails to state which limitations the ALJ left out. Nor does the undersigned find any errors on the ALJ's part here based on his alleged errors in evaluating the objective medical and lay evidence in the record or in discounting plaintiff's credibility, since the ALJ made no such errors. Plaintiff argues as well that he should have been found disabled at this step, because the vocational expert testified that an individual whose productivity dropped by ten percent or more would not be able to maintain employment. See AR 34. But the record does not support such a limitation, and the ALJ, therefore, was not required to adopt it.

## CONCLUSION

Based on the foregoing discussion, the undersigned recommends the Court find the ALJ properly concluded plaintiff was not disabled. Accordingly, the undersigned also recommends

REPORT AND RECOMMENDATION - 17

that the Court affirm defendant's decision.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have **fourteen (14) days** from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **March 30, 2012**, as noted in the caption.

DATED this 14th day of March, 2012.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION - 18